In re JOHNS–MANVILLE
CORPORATION, et al.,
Debtors.

MANVILLE CORPORATION, Plaintiff,

v.

The EQUITY SECURITY HOLDERS
COMMITTEE, et al., Defendants.

Bankruptcy Nos. 82 B
11656—82 B 11676.
Adv. No. 85–6657A.

United States Bankruptcy Court,
S.D. New York.

Oct. 28, 1986.

Levin & Weintraub & Crames, (Herbert S. Edelman and Andrew Kress, New York City, of counsel), Davis, Polk & Wardwell, (Lowell Gordon Harriss and Laureen Bedell, New York City, of counsel), for debtors.

Milbank, Tweed, Hadley & McCloy, (John J. Jerome and John Gellene, New York City, of counsel), for Creditors Committee.

Fried, Frank, Harris, Shriver & Jacobson, (Matthew Gluck, New York City, of counsel), for Leon Silverman, Legal Representative.

Caplin & Drysdale, Chartered, (Elihu Inselbuch, New York City, of counsel), for Asbestos Health Committee.

Hahn & Hessen, (George Hahn, Steven J. Mandelsberg and Thomas D. Gettler, New York City, of counsel), for Equity Sec. Holders Committee.

Kronish, Lieb, Weiner & Hellman, (Laurence J. Kaiser and Karen Klein, New York City, of counsel), for Certain Holders of Common Stock.

BURTON R. LIFLAND, Bankruptcy Judge.

I *Background:*

A. The Posture of the Instant Proceeding

The instant adversary proceeding is before this court pursuant to the remand of the Second Circuit. *In re Johns-Manville*, 801 F.2d 60 (2d Cir.1986). On August 19, 1985 Leon B. Dubin, a Manville common stockholder and a member of the Equity Security Holders Committee ("Equity" or the "Equity Committee") brought an action individually and on behalf of the Committee in the Delaware Chancery Court (the "First Delaware Action"), seeking an order to require the Johns-Manville Corporation ("Manville" or the "Debtor") to call an annual shareholders meeting. No such meeting had been called since the Debtor filed its petition for reorganization in August of 1982. The stated purpose of the Delaware action was to elect a new Board of Directors who would withdraw from consideration the Principle Elements Agreement between Manville and various of its creditor constituencies, which the Manville Board of Directors had approved on August 2, 1985.

Manville responded to the First Delaware Action on August 27, 1985 by filing a complaint against the Equity Committee and its members seeking to enjoin the Delaware action or in the alternative to prevent any elected official from taking office until this court's approval was obtained. This court granted summary judgment in favor of Manville on September 11, 1985, enjoining the Equity Committee collectively and Dubin from pursuing the First Delaware Action on the grounds that a shareholders meeting would have "devastating" consequences to the Debtor's reorganization. *In re Johns-Manville Corporation*, 52 B.R. 879, 887 (Bankr.S.D.N.Y.1985). The District Court affirmed that decision, finding that the actions of the Equity Committee constituted a clear abuse which threatened "this extraordinary and fragile reorganization", thus justifying the injunction. *In re Johns-Manville Corporation*, 60 B.R. 842, 854 (Bankr.S.D.N.Y.1986). On September 10, 1986, the United States Court of Appeals for the Second Circuit reversed and remanded the summary judgment decision, directing this court to hold an evidentiary hearing to "undertake a more elaborate inquiry into clear abuse and irreparable harm." slip opinion at 21.

On September 16, 1986 a second group of common shareholders (the "Wright Group") commenced an action seeking identical relief to that sought in the First Delaware Action by the Equity Committee (the "Second Delaware Action"). Manville amended its complaint to include the Wright Group on October 1, 1986 and an intervening complaint was served by the Committee of Asbestos Health Claimants (the "AH Committee"), the Official Committee of Unsecured Creditors (the "Creditors Committee") and the Legal Representative for Future Claimants (the "Legal Representative").

In accordance with the Second Circuit's mandate, one week ago this court concluded an extensive trial pursuant to the remand.

B. The Turbulent Proximal Overture to the Trial

At a scheduling conference, October 17 was specifically set as the date for the remand hearing. This was done in order to have time to conduct a trial here, but not necessarily to interfere with the trial schedule which had been established on short notice by the Delaware Court of Chancery, at the request of the Wright Group. Transcript of Proceedings dated October 10, 1986.

On October 1, 1986, the court granted Manville's motion to amend its complaint, and the members of the Wright Group were added as named defendants for the purposes of trial in this court. (Hereinafter, the Equity Committee and the Wright Group will be referred to collectively as the "Equity Interests".) On October 8, 1986, however, Delaware counsel for the Wright Group (which is also Delaware counsel for the Equity Committee) request-

ed that the Delaware Vice-Chancellor move up the trial on the merits of the *Wright* action in Delaware to October 14. That litigation tactic by the Wright Group created the spectre of needless conflicts among courts in the state/federal system, with the potential for undermining the principles of comity and accord explicit in this court's original trial scheduling directive.

On October 9, counsel for Manville informed the court of the action of the counsel for the Wright Group in Delaware. The parties were informed that Manville would present to this court for signature an order restraining the Wright Group from further prosecution of its action in the Delaware court until this court could try the matter on October 17 and decide the issue. Transcript of Proceedings dated October 9, 1986.

On October 10, after all parties were heard, the order was entered. Transcript of Proceedings dated October 10, 1986. (On October 20, during the trial, the court extended the restraint. Transcript of Remand Hearing 789). The Wright Group sought an immediate appeal to and summary reversal by Judge Goettel, who denied their action to hear and summarily reverse the grant of the restraining order. The Wright Group then proceeded to seek mandamus and prohibition against Judge Goettel and this court in the Second Circuit with respect to the grant of the limited, temporary relief.

One of the grounds the Wright Group raised was that this court lacked jurisdiction to try the action and to grant the temporary relief because the mandate of the Second Circuit had not yet issued. However, on October 11, 1986 the mandate of the Second Circuit did issue, and on October 14, 1986, Judge Goettel (apparently in reaction to the activity of the Wright Group before him) issued an order specifically remanding the matter to this court for resolution.

Therefore, in view of the explicit decision of the Second Circuit that this court has jurisdiction to entertain these matters, and the specific order of Judge Goettel, there is no question that this court had jurisdiction to proceed with the trial and determination of these issues.

The trial of this action commenced on October 17, 1986. The Equity Committee immediately moved to disqualify the undersigned from hearing this matter on the asserted ground that the court was a material witness and could not therefore preside over the trial. After hearing all the parties, this court issued a ruling denying that motion. Transcript of Remand Hearing ("Tr.") at 46 *et seq.* During the trial, the Equity Committee sought immediate *mandamus* and a stay which was denied by the Part I judge of the District Court. The trial was conducted on October 17, 20 and 21.

At the trial, the plaintiffs presented the testimony of five witnesses (Messrs. Parker, Stevens, Henderson, Young and Silverman), offered various exhibits, and referred the court to various proceedings and events during the four years of this reorganization case that are matters of record in this court. The only witness testimony presented by the Equity Committee was the testimony of an investment banker as a fact witness. The Equity Committee also proffered testimony by the same witness as a supposed expert in an area where his qualifications were shown to be dubious. The court determined that, for the purposes offered, such testimony would not aid the court in resolving the issues presented. Tr. 644–646, 682–701. *See, e.g. Liona Corporation, N.V. v. PCH Associates (In re PCH Associates)*, 804 F.2d 193, 197–198 (2d Cir.1986) (There is "wide discretion afforded a trial court whether expert testimony should be admitted or excluded.") *citing Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) ("The trial judge has broad discretion in the matter of the admission or exclusion of expert evidence and his action is to be sustained unless manifestly erroneous.") (citation omitted). The Equity Committee also offered various exhibits and portions of deposition testimony. However, none of the members of the

Equity Committee testified. The Wright Group offered the testimony of two witnesses (Mr. Charles Wright and Mr. Calvert Crary), various documents, and portions of one deposition.

Having considered all the evidence, the testimony and arguments presented at the trial as well as the materials in the record of these proceedings set forth in the annexed appendix (the "Appendix"), this court today holds that the efforts of the Equity Committee and the Wright Group to compel a shareholders meeting amounts to a clear abuse which puts Manville's ability to reorganize in real jeopardy and that Manville, the intervening plaintiffs and others not named as parties, will suffer irreparable harm if the shareholders meeting is not enjoined.

II   A Short History of the Manville Reorganization

A.   Introduction

Ordinarily the court would presume the reader's familiarity with the manifold proceedings in this well known reorganization or direct the reader's attention to: *G.A.F. Corp., Keene Corp. et al. v. Johns-Manville Corp., et al. (In re Johns-Manville Corp., et al., Debtors)*, 26 B.R. 405 (Bankr. S.D.N.Y.1983), *aff'd* 40 B.R. 219 (S.D.N.Y. 1984) [Decision No. 1 and Order in related automatic stay proceedings]; *The Asbestos Litigation Group, et al. and Occidental Chemical Corp. v. Johns-Manville Corp. et. al. (In re Johns-Manville Corp., et al., Debtors)*, 26 B.R. 420 (Bankr.S.D.N.Y. 1983), *aff'd in part* 40 B.R. 219 (S.D.N.Y. 1984), *rev'd in part* 41 B.R. 926 (S.D.N.Y. 1984) [Decision No. 2 in related automatic stay proceedings]; *Johns-Manville Sales Corp. v. Doan, Sweeney, and Sweeney, L.P.A., (In re Johns-Manville Corp., et al.,*

*Debtors)*, 26 B.R. 919 (Bankr.S.D.N.Y. 1983); *Johns-Manville Corp. et al. v. The Asbestos Litigation Group et al., (In re Johns-Manville Corp., et al., Debtors)*, 33 B.R. 254 (Bankr.S.D.N.Y.1983), *aff'd*, 31 B.R. 965 (S.D.N.Y.1983); *In re Johns-Manville Corp. et al., Debtors*, 36 B.R. 727 (Bankr.S.D.N.Y.1984), *appeal denied*, 39 B.R. 234 (S.D.N.Y.1984), *reh'g denied*, 39 B.R. 998 (S.D.N.Y.1984), *cert. denied*, 749 F.2d 3 (2d Cir.1984) [Asbestos Health Litigants motion to dismiss Chapter 11 petition denied]; *In re Johns-Manville Corp., et al., Debtors*, 36 B.R. 743 (Bankr.S.D.N.Y. 1984), *appeal denied*, 39 B.R. 234 (S.D.N. Y.1984), *reh'g denied*, 39 B.R. 998 (S.D.N. Y.1984) [Decision and Order appointing legal representative upheld]; *see also In re Johns-Manville Corp.*, 47 B.R. 957 (S.D.N. Y.1985); 52 B.R. 940 (S.D.N.Y.1985) [orders affirming appointment of Legal Representative]; *Johns-Manville Corp., et al. v. The Equity Security Holders Committee, et al. (In re Johns-Manville Corp., et al., Debtors)*, 52 B.R. 879 (Bankr.S.D.N.Y. 1985), *aff'd*, 60 B.R. 842 (Bankr.S.D.N.Y. 1986), *rev'd and remanded*, 801 F.2d 60 (2d Cir.1986); *The Dade Country School District v. Johns-Manville Corp., et al., (In re Johns-Manville Corp., et al., Debtors)*, 53 B.R. 346 (Bankr.S.D.N.Y.1985); *In re Johns-Manville Sales Corp.*, 57 B.R. 680 (Bankr.S.D.N.Y.1986); *The Committee of Asbestos-Related Litigants v. Johns-Manville Corp., et al., (In re Johns-Manville Corp., et al., Debtors)*, 60 B.R. 612 (Bankr. S.D.N.Y.1986) for a complete background. However, the particular questions at issue in this remand proceeding, are born of the unique history of this fifty month old reorganization. It is therefore helpful to presently reexamine events aided by the record, including witness testimony and evidence considered at the trial.[1]

1. The following witnesses testified at the remand hearing:
—*George Earl Parker:* ("Parker") Executive Vice President and Director of Johns-Manville Corporation. He is in charge of the corporation's legal affairs, with responsibility for the insurance and risk management department, workers compensation department and corporate communications. During the course of the

reorganization he has served as a primary negotiator and spokesperson for the corporation.
—*Thomas W. Henderson:* ("Henderson") An attorney who has served as a negotiating member of the Asbestos Health Committee. Mr. Henderson was the first chairperson of the Asbestos Litigation Group (a nationwide steering committee for asbestos health litigation) and

For convenience, portions of the transcripts cited in this opinion are set forth at length. The remand hearing transcripts are referred to by the party who testified and the transcript page on which the testimony appears. Transcripts of other hearings that are a part of the record before this court are referred to by the date on which the hearing occurred, the topic of the hearing, and the relevant page of the transcript.

has been a member of the Asbestos Health Committee since its inception.

—*William Thomas Stevens:* ("Stevens") Presently the President and Chief Executive Officer of Johns-Manville Corporation. He has held a variety of managerial positions in Manville and its affiliates through his career.

—*Calvert Crary:* ("Crary") A litigation analyst at Bear Stearns who has written about the Manville reorganization on a number of occasions. Although not a plaintiff, Mr. Crary has played an active role in the Second Delaware Action.

—*Michael Young:* ("Young") Counsel to, and one of the principal negotiators for, the Big City Property Damage Creditors Committee. In addition, Mr. Young has also worked with the State Government Creditor's Committee's counsel and the committee representing the interests of schools and hospitals.

—*Leon Silverman:* ("Silverman") The Legal Representative for Future Claimants. Future Claimants are defined as "all persons and entities who, on or before August 26, 1982, came into contact with asbestos or asbestos containing products mined, fabricated, manufactured, supplied or sold by Manville and who have not yet filed claims against Manville for personal injuries or property damage." *In re Johns-Manville Corp.,* 36 B.R. 743, 744–45 (Bankr.S.D.N.Y. 1984), *aff'd,* 39 B.R. 234 (S.D.N.Y.1984), *see also* 52 B.R. 940 (S.D.N.Y.1985). Future claimants were determined to be parties in interest and entitled to representation in the Manville reorganization on January 23, 1984. *Id.* Mr. Silverman was appointed to represent these claimants, by order of this court, on August 19, 1984.

—*Robert Minicucci:* ("Minicucci") Senior Vice President of Shearson/Lehman Brothers, the Equity Committee's investment bankers. Mr. Minicucci supervised the Shearson client team assigned to work for the Equity Committee.

—*Charles W. Wright:* ("Wright") Associate Director of the Bear Stearns Chicago office. Mr. Wright is one of the named plaintiffs in the Second Delaware Action.

2. The interests of each of the constituencies in the reorganization have been represented by the following parties:

### B. The Bankruptcy Petition and Events Leading to the Filing of the First Plan

1. August 26, 1982—Manville Files its Chapter 11 Petition

a. The relationships between the constituencies [2]

The Johns-Manville Corporation was a leading producer of asbestos products which were used pervasively in a variety of industries for several decades throughout the United States. In the early 1970's as-

—*The Official Committee of Unsecured Creditors:* (the "Creditors Committee") represents general unsecured trade and bank debt.

—*The Asbestos Health Victims Committee:* (the "AH Committee") represents known victims of asbestos related diseases with claims against Manville.

—*The Legal Representative for Future Claimants:* (the "Legal Representative") represents all persons and entities who, on or before August 26, 1982, came into contact with asbestos or asbestos containing products mined, fabricated, manufactured, supplied or sold by Manville and who have not yet filed claims against Manville for personal injuries or property damage. These claimants may be unaware of their entitlement to recourse against Manville due to the latency period of many years characterizing manifestation of all asbestos related diseases.

—*The Co-Defendants Committee:* (the "Co-Defendants") represents other manufacturers of asbestos products who may share liability with Manville in asbestos related lawsuits.

—*The Official Committee of Equity Shareholders:* (the "Equity Committee") originally represented the interests of both preferred and common shareholders. On July 31, 1986, due to a conflict that developed in that representation, the Equity Committee was disbanded. The Committee still represents the interests of equity in specific matters before this court, including the instant action.

—*The Unofficial Committee of Preferred Shareholders:* (the "Preferred Shareholders") represents the interests of holders of Manville preferred stock.

—*The Wright Group:* consists of some 300 shareholders who own approximately 10% of Manville common stock, purchased subsequent to the filing of Manville's Chapter 11 petition.

—*The Unofficial Committee of Property Damage Claimants:* represents the interests of private and public institutions who have asbestos related property damage claims against Manville. This group consists of three sub-committees: the Big City Property Damage Committee, the State Government Creditors Committee and a committee representing the interests of schools and hospitals.

bestos was linked to a number of serious, often fatal diseases ("asbestos related diseases"). Presently, tens of thousands of individuals are known to suffer from asbestos related diseases and due to the nature of the illness, there are many thousands more who have yet to manifest the disease. Before it filed its Chapter 11 petition, Manville litigated the tort claims of asbestos victims for several years, during which time the liability of asbestos manufacturers was established. Pursuant to 11 U.S.C. § 362(a), all suits against Manville, including the asbestos related tort suits, have been stayed. As a consequence no asbestos health victim has received any compensation from Manville since the filing date. At the time of the filing Manville was experiencing an ever increasing number of suits brought against it, ever larger verdicts and substantial punitive damage awards.

Had Manville not sought the protection afforded by Title 11, its continuation as a viable enterprise would have been acutely threatened by the ever increasing number of judgments rendered against it in asbestos related suits. Such a denouement would have left thousands of present and future victims without compensation or any recourse, save to a mere corporate charter. *See In re Johns-Manville Corp.*, 36 B.R. 743, 756 (Bankr.S.D.N.Y.1984), *and In re U.N.R.*, 29 B.R. 741, 748 (N.D.Ill.1983). From the beginning of this reorganization it has been a principal goal of responsible elements within the constituencies comprising the parties in interest to resolve the difficult financial and legal questions raised by the unique nature of the massive asbestos related litigation burdening this country's courts. Parker Tr. 98[3]; October 17, 1984 Hearing on Motions to Extend the Property Damage Bar Date, Tr. 84. Furthermore, the interested parties all realized in some measure that a consensual plan and viable surviving corporation would best serve the interests of the asbestos victims and they have struggled throughout these proceedings to achieve that goal. October 27, 1983, Hearing on Extension of Exclusivity, Tr. 45–46[4]; Young Tr. 460–61[5]; February 14, 1986, Hearing on First Amended and Restated Plan of Reorganization, Tr. 18–19[6], 33–34, 34–37[7].

**3.** Mr. Parker testified that Manville wanted a plan of reorganization that would "remove from the hundreds of courts around the nation, the thousands and literally 17,000 tort claims that were pending against us at that time, to bring those into one proceeding where they could be resolved equitably, evenhandedly and we hoped, expeditiously."

**4.** The court stated that the parties needed "to bargain earnestly with the ultimate view of the victims and the victims alone as being part and parcel of the solution here and the fastest delivery system."

**5.** Mr. Young, describing the evolution of the property damage settlement, testified: "We also became more and more convinced, that the appropriate policy response on the part, at least of the public entities—and most of the claimants are public entities—was that we should subordinate our claims to those of the asbestos health claimants."

**6.** Mr. Silverman, the Legal Representative, stated: "The objective of the Plan is to pay fair compensation to the tens of thousands of seriously ill people who suffer from asbestos-related disease and who will suffer from that kind of disease."

**7.** The court stated: "Given the vast, unique societal value of this complex reorganization and the longstanding inability of the various and often hostile interests to come to terms with any form of harmonious solution ... it is most gratifying that the most disparate groupings of interest, to wit, the Debtor and tort victims past and future, the property damage claimants, consisting of governmental agencies, hospitals, schools and others, and quite possibly ... Manville's litigating Co-Defendants, who, too, have a stake in the resolution of this matter, that they have found agreeable the major elements of a solution that are contained in the plan filed today."

"It is ironic that the interests that are presently disturbed by their treatment in this otherwise consensual plan are those interests found in a more normal or traditional public interest reorganization."

"I would hope that the purely economic parochial interests of the commercial and shareholding entities, no less than all other affected parties in interest, can quickly blend themselves into the reorganization whole, given the grim realities of this reorganization, which must be reconciled with the real world."

Given the variety of competing interests and complicated issues to be resolved in this reorganization, it is not surprising that the struggle towards the goal of a consensual plan has been punctuated by difficulty, delay, hostility, steadfast confrontation and at times, desperation. Nevertheless, a sense of dedication and disdain for failure formed an undercurrent that kept the parties bargaining in earnest. Some of the major issues raised in this reorganization include whether future claims are legally cognizable or susceptible to any form of channeling through the vehicle of a Chapter 11 reorganization, the development of a procedure to evaluate and process asbestos health claims (the delivery system), the extent of liability for property damage claims, and the control and disposition of insurance industry litigation with Manville, involving declined coverage of amounts measured in billions of dollars. April 5, 1983, Hearing on Extension of Exclusivity, Tr. 34–36, October 27, 1983, Hearing on Extension of Exclusivity, Tr. 38–39 [8]. In short, a consensual plan in this reorganization must address the needs of non-traditional interest in bankruptcy (i.e. the tens of thousands of health claimants and other asbestos linked claimants), yet satisfy the demands of traditional bankruptcy interests such as the Debtor itself and its general creditors and shareholders. Achievement of such an accord is predicated on the willingness of each competing interest to sacrifice significant items on its agenda, and in many instances, a readiness to sacrifice sacred cows to a more compelling need.

Early negotiations toward accommodation were further handicapped by the animosity and litigiousness that have characterized the Debtor's relationship with many groups from the very outset of the case. While this was particularly true of the adversarial litigating relationship between pre-petition Manville and the AH Committee (Parker Tr. 100–01 [9]; Henderson Tr. 302 [10]; May 12, 1983, Oversight Hearing, Tr. 46–47; Silverman Tr. 507–08 [11]), it has also been true at various times throughout

---

8. John Jerome, counsel to the Creditors Committee stated: "The reality is, Your Honor, that we have here in this case a failure by our country and our legislators to come to grips with the problems of a society in a post industrial revolution ..."

"The end result of all of this may very well be that a company like Manville which has been in business for ... one hundred twenty-five years, may vanish from the face of the earth because of the inability or lack of will on the part of federal legislators to deal with this problem."

"So it devolves upon this Court with its jurisdiction to try to solve a problem that should ultimately be solved in another forum."

"And the Court, Your Honor, has struggled and has helped all of the constituents over these long and arduous fifteen months to try to come to a consensual resolution as reasonable men to solve an almost insoluble problem."

9. Mr. Parker testified: "The asbestos litigants, asbestos related Creditors Committee was largely composed of attorneys who had represented claimants in litigations against Manville over the past decade."

"Those litigations were very hard hitting and sometimes acrimonious and that attitude carried over into the Chapter 11 committee representing that group of claimants."

"The meetings and confrontations were acrimonious, they were often boycotted by one or another party."

"They more often than not broke up in anger."

"There were obscenities thrown across the conference room table and sometimes worn on the T-shirts of participants."

"It was just a very bitter, distrustful confrontational sort of relationship."

10. Referring to the attitude of the AH Committee to Manville's Chapter 11 petition, Mr. Henderson testified: "Well, the reaction in 1982 was one of extreme anger and bitterness and hostility toward Manville generally. We viewed it perhaps naively, but we viewed it nonetheless as an outrageous abuse of the Bankruptcy laws and intended to press forward with a motion to dismiss as quickly as we could."

11. Discussing the nature of the relationship between the Asbestos Health Claimants and the Debtor at the time of his appointment as Legal Representative, Mr. Silverman testified: "At that time, as I recall it, Johns-Manville was either not speaking with or was speaking epithetically with the asbestos health claimants."

"That was a breach that I had been informed of earlier but which after speaking with both sides appeared to me at that time to be unbridgeable. Neither side could be in the same room with the other for very long without nasty things being said...."

"Some members [of the AH Committee] wanted Manville to be liquidated, to go out of business."

"They posited it in terms of the inherent immorality of what the company had been doing

the proceeding of other constituencies. Parker Tr. 101-02 [12]; Silverman Tr. 508, Parker Tr. 104-05; Silverman Tr. 508-09 [13]; Parker Tr. 195-98 [14]. Furthermore, in the early years of the reorganization, the parties usually chose to negotiate in multilateral sessions. This style of negotiation would in time prove to be unavailing. Parker Tr. 109-10 [15]; Silverman Tr. 506-07 [16]. Finally, several major constituencies whose participation would prove necessary to achieve a successful reorganization, did not materialize in the first years of the reorganization (e.g., the Legal Representative, the Unofficial Committee of Preferred Shareholders and the Property Damage Claimants. This latter group of property damage claimants include multitudinous state and local governments, thousands of schools, hospitals and property owner claimants who have filed over $80 billion in claims as of the bar date for the filing of such claims.).

b. Efforts to achieve a global plan or a lump sum settlement

In the first year of the reorganization the parties negotiated around two possible

through the many years of litigation and the couple of years of the reorganization."

"They doubted Manville's bona fides, they were just in a position where they had no confidence in or use for Manville."

"Manville reciprocated that in full measure."

12. Describing the history of the relationship between the Debtor and the Creditors Committee, Mr. Parker testified: "Well, at the outset I think the Committee of Unsecured Creditors were surprised and somewhat dismayed that a large industrial corporation, which had been earning tens of millions of dollars each year, would file for Chapter 11 reorganization."

"Particularly some of the banks represented on that committee felt that they had been caught in this filing and were—dismayed is perhaps too light a term—I think they, too, felt betrayal and distrust."

"I think in a fairly short time we were able to convince most of that committee of the necessity for reorganization for Manville."

"Some on the committee were never convinced and some still hold the belief that Manville's actions in filing were totally improper and unjustified under the circumstance[s]."

"Relations with that committee have changed over the past four years as they have changed with all of the committees."

"There sometimes have been support, there sometimes have been fierce opposition, there sometimes have been friendly, cordial relationships and sometimes bitter and hateful relationships."

13. Describing the attitude of the Co-Defendants at the time of his appointment, Mr. Silverman testified: "The Co-Defendants were of the firm opinion that Manville would never have a plan, that Manville was going through a charade."

"That, in essence, Manville was trying to buy off the present claimants and the future claimants on the cheap, leaving the burden to be picked up by them and they were in a position of threatening dire consequences."

14. Describing the relationship between the Equity Committee and the Debtor, Mr. Parker testified: "I think that the relationship began to change somewhat at the time of the Williamsburg conference which would have been in the summer of 1984 as the Equity Committee began, I believe, to be threatened in their position of retaining one hundred percent ownership of the equity stocks of the company."

"The relationships became somewhat more strained and more tension developing then, at the time the Principle Elements Agreement was being negotiated or discussed and there began to be direct disagreements as to the extent to which the company should go in using a portion of the equity to satisfy demands on the estate.... There was clearly a change in relationships because the company obviously during that time frame was seriously entertaining a proposal which would adversely impact the equity interest and would result in their interest being diluted to a significant degree. So I think the relationship did have a change, that there was a more pulling away, more beginning of a confrontational relationship."

15. Mr. Parker testified: "As a general statement those negotiations during that time frame were conducted in large conference rooms with all of the parties being represented."

"Sometimes thirty, forty, fifty people present, most of them lawyers, each having a position to state on practically every issue that was discussed...."

"It was—I guess I will have to say that in that arena with so many parties present that there was very little forward movement in those negotiations. They most often broke up in anger and distrust with little being resolved."

16. Describing the status of negotiations between the parties at the time of his appointment, Mr. Silverman testified: "Well, after discussion with the various constituencies it was clear to me from what they said that negotiations which had been going on for sometime, which apparently encompassed in large measure group negotiations, had failed to produce a resolution of the various problems."

goals: a "global" plan or a "lump sum" settlement of the claims of asbestos victims. A global plan would have used the vehicle of the Manville reorganization to settle the claims of all asbestos victims against *all* asbestos manufacturers and their insurers (real or putative). While the concept was supported by the Creditors Committee and the Co-Defendants, it was vigorously opposed by the AH Committee. Parker Tr. 112–13[17]; February 17, 1983, Hearing on Johnnie Leon Patton Litigation and the Status of Plan Negotiations, Tr. 15–16. Despite the strong efforts by many of the parties, it proved impossible, given the existing distrust, to negotiate such a plan. May 23, 1983, Hearing on Extension of Exclusivity, Tr. 13; June 9, 1983 Oversight Hearing, Tr. 57, 60[18]. Parenthetically, it should be noted that the construct of the present plan is not preclusive of a non-bankruptcy integration into a larger settlement involving all asbestos health claimants, co-defendant manufacturers, and their insurers.

Concurrent with its efforts to achieve a global plan, Manville and the AH Committee pursued a course of negotiations in hopes of liquidating and paying off claims limited to known health victims in a lump sum payment. The parties negotiated intensively over a sustained period of time while the other parties in interest and this court encouraged these attempts. Those efforts were to no avail. Settlement talks broke down with the parties separated by $300 million dollars and the firm belief of Manville that plaintiff's lawyers should not receive their fees on payments to victims out of the lump sum settlement. Parker Tr. 114; August 25, 1983 Oversight Hearing, Tr. 16–19; September 13, 1983, Hearing on Extension of Exclusivity, Tr. 39–40; June 9, 1983, Oversight Hearing, Tr. 103–04, 106.

c. The M1–M2 Plan

In November of 1983 Manville unilaterally filed a plan of reorganization commonly known as the "M1–M2" plan. Under this plan the Debtor would have transferred the

**17.** Describing the reaction of the various constituencies to the global plan, Mr. Parker testified: "The reaction always varied all over. There were many who firmly believed that Manville's reorganization was Manville only."

"The asbestos health litigants' group did not, I spoke generally, want any effort made to remove the other litigations into a Manville type reorganization proceeding."

"They were generally in opposition to that sort of global resolution. They felt very strongly that their clients were entitled to jury trials for the resolution of their complaints and were opposed to any effort to go to an administrative compensation type plan with Manville's reorganization being an extra focus of the commercial creditors' group, the unsecured creditors' group was, I think, willing to entertain such a global resolution, but again it was not their primary focus or interest."

"The Co-Defendants were largely the driving force in that effort and they drove very hard, many threats to appoint a Trustee, to appoint a legal representative, to force Manville out of reorganization."

"We did negotiate on the plan that would bring the Co-Defendants into the Manville reorganization or put Manville into that group claims resolution facility, there was negotiations with the percentage of liability Manville would have or ought to have vis-a-vis the other Defend-

ants, and in those negotiations I would say six months or more to come to a conclusion...."

"We [Manville] were certainly attracted to it in concept, although it proved to be very illusive in practically [sic] to get any degree of support from the creditor constituencies was not possible."

**18.** Comparing the difficulties faced in the plan negotiations to those faced by the superpowers in the efforts to end the nuclear arms race, Arthur Olick, counsel for Keene Corporation, a Co-Defendant, stated: "We are rushing head long towards a global solution by taking three steps backward for every step forward."

"These negotiations remind [me] of the Strategic Arms Limitation negotiations."

"The superpowers meet one day and adjourn for a year."

"That may be fine for the United States and Russia. It is not fine in these negotiations."

Other parties similarly described the negotiations in metaphors, which, with the benefit of hindsight, cannot be described as hyperbole. Responding to a comparison of the global plan negotiations to Odysseus' twenty year journey back to Ithaca, David Berger, counsel to the School's Committee, stated: "Speaking of Odyssey, I am not even as concerned as my distinguished colleagues are about a twenty year Odyssey, I am more concerned about a thirty years war."

business operations of the company to a new corporation (M2) which would have been insulated from asbestos litigation. The Debtor's insurance and some other assets would have remained in the present company (M1) to pay off asbestos and creditor claims. The M1 corporation would have received payments from the M2 corporation until all claims were paid off. Parker Tr. 116. Under the M1–M2 plan equity shareholders would have retained 100 percent of their interest in the corporation. Parker Tr. 117.

With the exception of the Equity Committee, Manville failed to acquire the support of any constituency in the reorganization for this plan. Parker Tr. 117. Arthur Olick, counsel for Keene Corporation, a Co-Defendant, at a hearing before the plan was actually filed, described Manville's efforts in support of the plan as a "blueprint for litigation." May 12, 1983 Oversight Hearing, Tr. 32–34. The AH Committee in particular strenuously opposed the M1–M2 plan. Henderson Tr. 302.[19]

## 2. 1984—The Foundations for Consensus are Laid

Several events transpired and several steps were taken in 1984 which in time would prove to be of great significance to this reorganization: the motion by the AH Committee to dismiss Manville's Chapter 11 petition was determined; Mr. Leon Silverman was appointed as Legal Representative for Future Claimants (the "Legal Representative"); Manville reached a settlement with several of its largest insurance carriers. It was also during this year that Mr. Jamison, a member of the Creditors Committee proposed a course of negotiations that came to be called the "Jamison Plan".[20] In another sense, however, this year was much like the preceding 15 months since the Chapter 11 petition was filed. Negotiations were often difficult and acerbic affairs. Because of divisiveness within each of the constituencies, progress seemed to be measured in small steps forward, punctuated by delay. The asbestos health claimants remained uncompensated and their numbers continued to grow as disease continued to manifest itself in accordance with the predictions of epidemiologists.

a. The motion to dismiss Manville's petition and the decision to appoint a representative for future claimants

In January of 1984 this court denied motions brought by the AH Committee and various other parties to dismiss Manville's Chapter 11 petition as being brought in bad faith. *In re Johns-Manville*, 36 B.R. 727 (Bankr.S.D.N.Y.1984), *aff'd*, 39 B.R. 234 (S.D.N.Y.1984). In a companion decision rendered at the same time the court, despite authority to the contrary, recognized the status of future victims of asbestos related diseases as parties in interest in the Manville reorganization and set the stage for the appointment of a legal representative for future claimants. *In re Johns-Manville*, 36 B.R. 743 (Bankr.S.D.N.Y. 1984), *aff'd*, 52 B.R. 940 (S.D.N.Y.1985). In August 14, 1984, Mr. Leon Silverman was appointed the Legal Representative for Future Claimaints (the "Legal Representative") with the responsibilities and powers similar to those of an official committee under 11 U.S.C. § 1103.

The need for representation of the future claimants as a spur to the negotiations through a party in interest was obvious to this court and some of the constituencies

---

**19.** Describing the reaction of the AH Committee to the M1–M2 plan, Mr. Henderson testified: "It confirmed our worst feelings about what was intended with respect to . . . the filing of the Chapter 11 . . . was to deprive and continue to deprive by virtue of the automatic stay provisions of Section 362, of our clients' days in Court, and that also then necessary delay in the compensation that would be otherwise awarded through settlements or verdicts and judgments."

"So, in short, nothing much changed in our view between Manville and our committee for at least the first two, if not the first three years, of this Chapter 11 proceeding."

**20.** The Jamison Plan was not filed with this court. Rather, like the Silverman Plan and the Principle Elements Agreement, it served as a framework within which the parties could negotiate to reach an accord.

(May 17, 1984, Hearing on Extension of Exclusivity and the Appointment of a Legal Representative for Future Claimants, Tr. 9–10 [21]). The placement of this representation at the bargaining table has proven to be a critical element in the development of a broad approval of the plan presently under consideration. The accord between the parties which was to develop was not at all apparent to the parties at the time of Mr. Silverman's appointment. Many, then, regarded the role he might play in the reorganization efforts with distrust. Silverman Tr. 510 [22].

### b. The Jamison Plan

In early 1984 the parties began to negotiate around a set of principles proposed by Mr. Jamison, a member of the Creditors Committee. Negotiations on these principles were delayed until the summer of 1984 by the litigation of the motions to dismiss Manville's Chapter 11 petition, discussed above. Parker Tr. 119. The plan provided for a trust vehicle to pay health claimants, funded in part by Manville stock. These two concepts, a trust and dilution of equity interest in favor of the asbestos victims, were considered 'breakthroughs' by the parties and negotiated quite seriously. Ultimately, these negotiations foundered. The parties again disagreed on the valuation of the health claims. The resolution of this issue depended in part on the nature of a settlement Manville had yet to reach with its insurance carriers. Parker Tr. 119–121, Henderson Tr. 303, July 26, 1984 Hearing on Plan-Related Litigation and Plan Negotiations, 15–16. Parker Tr. 120–22 [23];

21. Discussing the Jamison plan negotiations, Arthur Olick, counsel for Keene Corporation, a Co-Defendant, stated: "If your Honor, please. I can confirm that for the first time, in my judgment, in these proceedings there are real negotiations that are taking place in the true sense of the word 'negotiation'. Some of the essential problems are being addressed. However, they are being addressed with an empty chair.... I believe it is a very essential item and that there can be no consensual plan of reorganization without consideration of those future claimants: only a legal representative can speak for that and we should move that ahead as fast as possible."

22. Mr. Silverman testified: "On the other hand, other constituencies viewed my appointment with great hostility and suspicion. They feared that I was the tool for Manville and in some way would be another voice in support of Manville. I think that was a view that was held by many of the people on the Asbestos Health Committee. There was a great deal of suspicion about my activities...."

23. Mr. Parker testified: "We discussed a great many possibilities in terms of proposals and combinations of proposals and scenarios on how many claims might be expected, and what the average cost per claim might be, and how much the Manville stock might be worth at the time it was required to be sold, and how many claims would be paid per year and those things and many, many different combinations were discussed by all of the constituents at that conference...."

"We felt, I suppose, somewhat like the recent Iceland summit conference that we were making significant progress up until the very end when other demands were surfaced that the company's representatives, myself in particular, felt were beyond the ability of the company to afford and the conference again unfortunately broke up in anger and distrust...."

"The Jamison concept, I think, came closer than any previous proposal to garnering acceptance by those Committees, came close to it but did not quite make the mark."

"The concept was fine, the trust was generally acceptable, although the asbestos health lawyers had not agreed to the mechanism procedure for negotiating, settling and evaluation claims, but the trust concept was attractive to them, it removed Manville from the claims evaluating procedure and that was an attractive feature."

"Commercial creditors, I think, generally supported it, even though the issue of postpetition interest had not been settled to their satisfaction at that time."

"The Co-Defendant group was not satisfied, but their opposition was not as strong to Jamison as it had been to some of the previous proposals."

"Generally, there was a feeling of movement toward a plan that could be accepted [but] as I said, at the last moment that plan, too, exploded on us and we never reached a level of consensus...."

"The Equity Committee felt that the demand on common stock to satisfy claims was larger than they would have liked to see, but I think that at least at the time of the Williamsburg conference they were amenable to the concept that common stock could be used for that purpose."

Henderson Tr. 303–04 [24]; July 26, 1984, Hearing on Plan-Related Litigation and Plan Negotiations, Tr. 15–16 [25].

#### c. The Insurance Settlement

In substantial measure the insurance industry has generally denied critical coverage to those manufacturers for judgments entered against them in asbestos related law suits. The question of coverage is being hotly contested in a massive, precedent setting, ongoing trial now years old, currently being conducted in a California state court. The amount and nature of any settlement Manville might agree to with its insurance carriers had clouded all plan negotiations in the reorganization proceedings. On July 19, 1984, the debtor announced an initial settlement for $315 million with some of its major insurance carriers. The settlement agreement provided, *inter alia*, that the insurance carriers would be provided a form of indemnity for future asbestos lawsuits. Subsequent follow-on agreements with other carriers have raised the amount of potential insurance settlements to a sum well in excess of $600 million. A fairness hearing to consider the insurance settlements is scheduled for next month. Under the present plan of reorganization any settlement money will be a component of the fund formulated for the health victims trust vehicle.

#### 3. 1985—The Silverman Plan and its Progeny

The appointment of the Legal Representative marked a significant change in the style and progress of negotiations in the Manville reorganization. Whereas before, negotiations were usually conducted with multiple parties present, Mr. Silverman chose to communicate with each party throughout his negotiations in order to obtain its views, but negotiate with only one party at a time. With appropriate deference to a former Secretary of State, this style of negotiating came to be referred to as "shuttle diplomacy". Silverman Tr. 510–12 [26].

**24.** Mr. Henderson testified: "I think the Jamison plan ... was the first indication that there may be even a glimmer of possibility that this thing could be—become meaningful to the victims of asbestos disease, the first discussions about the formation of the trust, the victims trust and how to deal with the funding apparatus with insurance coverage, with cash, with some amount of stock."

"That really never took shape very much in our view before, and I don't recall the particulars of why that plan was executed, except it didn't measure up in terms of what we felt was needed in terms of funding."

"The insurance litigation was clouding the issue. The coverage was clearly in dispute. There was an awful lot of money being spent in San Francisco on matters where we weren't altogether clear on how well that was being handled...."

"And so the discussions, if I could say, broke off as a result of a combination of the unclear nature of the settlement of the insurance matters, the continuing litigation in San Francisco, the injunction and the discussions about punitive damages, which I feel at that time a clear majority could not have been mustered to deal with that plan as it was viewed or not."

**25.** Mr. Crames, counsel for the Debtor stated "Insofar as the equity is concerned, I cannot at this point go beyond the structure of the so-called Jamison Proposal which has been reported and which has been set forth in the release

that Manville issued insofar as to the anticipated need to fund the settlement vehicle with a substantial amount of the present stock, and two thirds is the number that has been under discussion."

"The additional funding for that settlement vehicle is, as also has been reported, the full amount of the insurance proceeds as well as initial funding of cash and/or near-term receivables of not less than $100 million."

**26.** Mr. Silverman testified: "[S]ome people thought that I should act the role of the honest broker. Everybody recognized, however, that I had a constituency that I had been appointed to represent, so, that was rather a loosely used term."

"But since I had not been on the scene long enough to have engendered any great animus and everybody at that time was trying to take me into camp on their particular side, it was suggested that perhaps I could exercise a role by talking to the various constituencies to bring them into line."

"Pretty soon it became clear to me and to my staff that it would be necessary to get something out there so that people could address themselves rather than in great broad generalities to some specifics."

"We thought that without the Creditors Committee it probably would be an effort that would die aborning."

### a. The Silverman Plan

The plan proposed by the Legal Representative contained two features of the Jamison Plan that were considered 'breakthroughs' in the negotiation process: an independent trust vehicle, and the use of Manville stock to fund that trust vehicle. Under Mr. Silverman's proposal, Equity Interests would be diluted from between fifty and eighty percent.

The initial response to this plan was less than one of universal approbation. Manville was displeased that proposals had been put forward before it felt it had been adequately consulted. Silverman Tr. 515–516.[27] Mr. Calvert Crary, a Bear-Stearns [28] litigation analyst, who subsequently became actively involved in this litigation on behalf of the Wright Group, described the proposal in the May/June 1985 Bear-Stearns newsletter, the Litigation Review, and expressed his doubts as to whether Manville management would even consider the proposal seriously. Pl.Ex. 10 at p. 5.[29]

### b. The Principle Elements Agreement

After a period of exclusive negotiations with the Debtor Silverman Tr. 525, the Legal Representative and Manville announced agreement on the principle elements of a consensual plan in court on July 29, 1985. July 29, 1985 Hearing on Plan Negotiations and the Principle Elements Agreement, Tr. 6. The Manville Board of Directors approved the Agreement on August 2, 1985. Manville and the Legal Representative continued to negotiate terms of this plan until February 1986.[30] The Principle Elements Agreement is a milestone in the history of this reorganization. It was the first time the Debtor was able to reach an accord with any health claimant representative.

Once again the various parties in interest did not respond with immediate and total approval to this Agreement. The Asbestos Health Committee harbored doubts as to whether they had been "sold out" by the Legal Representative. Nonetheless, they negotiated their differences with Manville and the Legal Representative and by Feb-

---

"Nevertheless, a plan was formulated which ... has been called the Silverman plan, which represented the product of my thinking after talking to the various epidemiologists and investment bankers.... We met with the personnel of these various constituencies or their representatives."

"It became clear to me that the only way to get this off base was to put something on the table. That was done, I believe, in March or April of 1985...."

27. Mr. Silverman testified: "Upon the announcement of the Silverman Plan, or its release in Meeley's [a private litigation reporter], by persons other than myself, Manville expressed its extreme displeasure with our having, or with my having put forward a plan without adequately consulting with them, which they characterized, in the terms of this release, as being somewhat less than meeting their approval."

28. Bear Stearns is a prominent investment house with a well regarded reputation as a risk arbitrager. *See* Wright Tr. 769. Mr. Charles Wright, a named plaintiff in the Second Delaware Action, and an associate director in Bear Stearns' Chicago office, testified that, "Bear Stearns has been doing risk arbitrage for over sixty-five years and we have one of the finest reputations on the street for doing it." *Id.*

In August of 1985, as reported in the Andrews Publication, Stockholders and Creditors News Service concerning Johns-Manville Corporation et al, Bear-Stearns announced that it had taken a position in Manville stock. "In an Aug. 2 filing with the Securities and Exchange Commission, Bear Stearns said an investment group that includes Bear Stearns now holds an 8.5 per cent interest in Manville, 1,556,550 common shares from June 15 to July 26 for $8.125 to $9.50 a share." Manville common stock is presently trading for about $2.25 a share. *Wall Street Journal,* October 27, 1986, p. 55. Mr. Randall D. Smith, a limited partner of Bear Stearns, was appointed to Manville's Board of Directors in August of 1984.

29. Mr. Crary wrote: "The plan is so unnecessarily onerous for Manville shareholders that we don't believe the company will take it seriously."

30. The negotiations over the Principle Elements Agreement and the subsequent First Amended Plan continued, in fact, until this summer. The AH Committee expressed strenuous objections against the possibility that certain members of the Manville Board would have any involvement with the trust vehicle. These objections were consensually resolved.

ruary 1986 the parties had reached a consensus. In reaching this accord the AH Committee made a number of significant concessions. These include: relinquishing their rights to seek punitive damages, accepting an injunction prohibiting suits against the reorganized company, allowing any insurance settlements in excess of $615 million to be paid to the property damage claimants, requiring health claimants to initially attempt to settle their claims through the Manville claims settlement vehicle and accepting less than 100% of Manville stock to fund the trust vehicle. Henderson Tr. 307–308.

The Property Damage Claimants similarly expressed grave reservation on the announcement of the Principle Elements Agreement. August 5, 1985 Hearing on Plan-Related Litigation and Plan Negotiations, Tr. 13 [31]. Manville and the Property Damage Claimants, nonetheless negotiated a settlement of their differences. These negotiations were particularly hard fought and their success was due in large measure to the willingness of the property claimants to subordinate their $80 billion in filed claims in favor of the health victims, Young Tr. 460–461 [32]. In accepting a settlement vehicle of $125 million, the representatives for these claimants have agreed to a greater than 99% dilution of their claims. Even if their claims are discounted by 50%, the settlement vehicle only provides for .32% of their filed claims. Such a drastic discount, however, is economically unrealistic, in light of some of the litigating successes enjoyed by property damage claimants in other courts. Young Tr. 467.

c. February 1986—The First Amended Plan of Reorganization

When Manville filed its First Amended Plan of Reorganization in February 1986, a coalition consisting of the AH Committee, the Property Damage Claimants, the Legal Representative and the Debtor had been formed. The Equity Committee and the Creditors Committee remained, however, adamant in their opposition to the plan. February 14, 1986 Hearing on First Amended and Restated Plan of Reorganization, Tr. 14, 19–22. A number of preferred equity holders emerged and formed an unofficial committee that began to negotiate with the Debtor with respect to the plan. Parker Tr. 145. Silverman Tr. 538. Under the terms of the settlement, the preferred shareholders agreed to a greater than 50% dilution of their interest. Parker Tr. 148.

The basis of the objection of the Creditors Committee to the plan was the absence of any provision for post-petition interest. Parker 146. The Legal Representative was of the firm opinion that the plan should not provide for such interest. Silverman Tr. 568–69. After the First Amended Plan was filed, due to an apparent, inadvertent lapse in the exclusivity period, the Creditors Committee considered itself able to file its own plan of reorganization. The Debtor

---

**31.** Mr. Robert Soma, counsel to the Committee of State Property Damage Claimants, stated: "Like all other parties, except Mr. Silverman and Manville, we were excluded from the negotiation process."

"That was understandable, and if it produces a plan, it is commendable that Mr. Silverman undertook to do that."

"Unlike all the other creditor groups, the proposed plan does not provide any meaningful treatment for property damage claimants."

"I think it is important for the court, for Mr. Silverman and for Manville to understand that any plan that deals with us in a perfunctory manner or attempts to propose a plan premised on the fact we will disappear or that our claims will be reduced to an inconsequential amount is seriously flawed."

**32.** Mr. Young testified: "Our initial approach was that our claims had as much legal validity as the claims of any of the other creditors in the bankruptcy and therefore should receive whatever discount might be appropriate, given the nature of the bankruptcy.... Sometime between August and maybe October 1985 after lengthy discussions with the Legal Representative, we became convinced of the fact that the estate was not limitless, that there was a limited pot here."

"We also became more and more convinced that the appropriate policy response ... was that we should subordinate our claims to those of the asbestos health claimants."

"I should say the private entities who were not as or need not have been as politically sensitive to that, also agreed that that was the proper and appropriate policy decision."

and the various constituencies in favor of the First Amended Plan took great exception to this filing.

The Creditors plan was withdrawn subsequent to an agreement between the Debtor and the Creditors Committee pursuant to which the Creditors would receive some consideration for post-petition interest, although significantly less than they had demanded. The Legal Representative, despite his opposition to the payment of post-petition interest, agreed to this settlement, in the interest of securing a consensual plan of reorganization. Silverman Tr. 569.[33]

In August of 1986 the Debtor filed a Second Amended and Restated Plan to reflect the various settlements it had reached with its constituencies. Shortly before August this court granted a pending motion by the Equity Committee to disband itself. That motion was occasioned by the Debtor's settlement with the Unofficial Committee of Preferred Shareholders. The Equity Committee which had heretofore represented both common and preferred shareholders felt that the Debtor's settlement placed it in inescapable conflict.

In April the Committee lodged its motion to disband and to name separate committees to represent each form of its respective equity interests. At the Committee's request the motion was adjourned from time to time until July 31, 1986 when this court granted the motion to disband. The court did not grant the motion to appoint new committees. At that late date in the reorganization, such appointment would have been greatly disruptive. Instead the court permitted the disbanded Equity Committee to continue to represent Equity interests on specific matters (including the matters relating to the present proceedings). This court ruled, *inter alia,* that this representation, combined with the representation provided by the Unofficial Committee of Preferred Shareholders and the vigorous representation provided by the Wright Group was sufficient to presently protect the interests of equity. The court notes that such interests including the interests of the disbanded committee can always be heard, pursuant to 11 U.S.C. 1109(b) and, can be compensated without official status. *See* 11 U.S.C. 503 (b)(3)(D). The recent committee rulings are presently pending on appeal.

4. Efforts to Negotiate a Settlement with the Equity Interests

In reaching the accord in favor of the present plan a great many of the sacred cows of the consenting parties have been slaughtered. The Equity Interests alone refuse to negotiate from the consensual plan. Instead they profess to have been frozen out of the negotiations. As will be seen, this is simply not so. Equity leadership has simply refused to negotiate from a plan derived from the Principle Elements Agreement. Rather, they prefer to negotiate *de novo,* irrespective of whether such a stance is possible or realistic.

a. Negotiations with the Equity Committee

In June of 1985 the Equity Committee met with Manville's Board of Directors and urged them not to enter into any agreement based on the Silverman plan. Parker Tr. 130. Subsequent to the Board's approval of the Principle Elements Agree-

---

33. Mr. Silverman testified: "Since I am not by nature self-destructive and since I would like to accomplish the result of providing for the health victims, monies on a continuing basis, it appears to me now, and it appeared to me then, that it was indispensible that we should have a reorganization that would permit Manville to come out as a viable company, in order to do that it is necessary to make compromises, it is necessary to negotiate.... I didn't change my view [on post-petition interest] I changed the result that which I was prepared to agree to in order to have a consensual plan.... We entered into those negotiations with the commercial creditors. We traded as hard as we could, and because the commercial creditors are an essential part of a confirmation process, since they come way ahead, their views have to be accommodated and negotiated, and without them we would not have a plan. Now, did they get everything they wanted? Not by a long shot. But they negotiated. And I believe they negotiated hard and in good faith."

ment in August of 1985, representatives of equity urged the Board to reconsider this decision. At this time it was the position of the Equity Committee that any plan of reorganization should not dilute their interests greater than 50%. Parker Tr. 132 [34].

Instead, the Equity Committee proposed a "rollback" under which the Debtor would pay existing health claims and creditors and return to its pre-petition status. The Board rejected this proposal as unresponsive to the fundamental problems that plagued Manville prior to and throughout its reorganization. Parker Tr. 133–134 [35].

In August of 1985 the Equity Committee filed the First Delaware Action, calling for a shareholders meeting in order to elect a new Board for the purpose of withdrawing the present plan of reorganization. The court enjoined that action on September 20, 1985 and the case wound its way through the appellate process. The various parties continued a dialogue with the Equity Committee despite their opposition to the First Delaware Action, but found that the Equity Committee refused to negotiate from the plan that was then, and remains, under consideration.

> They would not negotiate from the plan that we had agreed to. That is the plan in the end of July, the Principle Elements Plan. Because our negotiations started with the equity holders on August 6, we met more often with the equity holders between August and the end of the year, I think, than with any other committee.... After they pursued their rights in Delaware, as they saw them, we con-

tinued to negotiate with them, horrendous though I thought that was.
Silverman Tr. 572.

### b. Negotiations with the Wright Group

In the April 1986 Bear Stearns Litigation Report, Mr. Crary described the Manville settlement with the Creditors Committee and proposed that equity shareholders "might do well by simply torpedoing the agreement [the plan of reorganization] altogether." At about that time Mr. Crary and Mr. Charles Wright, an associate director in the Bear Stearns Chicago office, began a course of conversations about steps shareholders might take to improve their position under the current plan of reorganization. Crary Tr. 434.

Mr. Wright, in addition to his duties as a Bear Stearns broker, makes substantial private investments in his own right. Wright Tr. 718. He first purchased Manville stock in 1984 after the corporation had filed its Chapter 11 petition and has held up to 30,000 common shares of the Debtor at various times in this reorganization. Wright Tr. 718, 765–766. Mr. Crary testified that he advised Mr. Wright that shareholders would need to retain an attorney to represent their interests in the reorganization proceedings and agreed to find an attorney for them. Crary Tr. 420–421.

While not himself a plaintiff in the Second Delaware action Mr. Crary testified that he has served as an "intellectual leader, making suggestions as to what is needed and how to go about getting it done and what would be good strategies to pursue." Crary Tr. 422. He provides advice and

---

**34.** Mr. Parker testified: "Representatives of the Equity Committee met with the Board, expressed their opposition to the plan concept, to the Silverman proposal concept, expressed their opposition to using such a large share of the equity to satisfy claims, expressed their feeling that more than fifty percent of the equity devoted to that purpose would be obscene and unjustified and urged the Board to not embark on that sort of plan of reorganization."

**35.** Mr. Parker testified that under the "rollback" proposal: "The company would pay existing asbestos health claims, pay existing creditors, and then return to a pre-1982 position, litigating

with asbestos health claims and presumably with property damage claimants on an as yet unresolved central issue that had forced Manville into reorganization in the first place.... The reaction ... [of the Manville Board of Directors to the rollback proposal] was that the proposal would partially satisfy existing present issues, but would not approach a satisfaction of the central issue that had caused the need for reorganization in the first place, that being the thousands of unresolved asbestos health claims and those that would be expected to be filed in the future."

strategy to the counsel for the Wright Group and acts as a liaison between the shareholders and their counsel. Crary Tr. 422.

The "Wright Group" consists of some 300 common shareholders, all of whom had purchased their shares of Manville stock after Manville filed its Chapter 11 petition. Wright Tr. 748. The 20 named plaintiffs in the Second Delaware Action are a subset of this group. Mr. Wright testified that approximately half of the members of the Wright Group are Bear Stearns customers. Wright Tr. 748–49. The refusal of the Wright Group to negotiate from the plan, interpreted in the most favorable light, can only be described as a buccaneering disregard for their status in this reorganization. Not only do they share the lowest rung on the ladder of distributive rights afforded by the Code with the common share interests of the Equity Committee, but the members of the Wright Group are the only parties to this proceeding whose participation can be said to be truly voluntary.

After the decision to bring this action was made Bear Stearns representatives informed shareholders who called their offices with questions about the Manville reorganization about the intended action and asked them "if they wished to be a part of it". Wright Tr. 755. Mr. Wright testified he was determined to bring that action whether other shareholders participated or not. Wright Tr. 752. In conjunction with the Second Delaware action, Mr. Wright began to prepare a list of candidates the Wright Group would propose for a Board of Directors election. Wright Tr. 736. Mr. Wright, however, has not shared the resumes of these potential candidates with any of the other plaintiffs in the Second Delaware action. Wright Tr. 755. Mr. Wright testified that he believes that the price of Manville stock would increase if a shareholders meeting were successfully called. Wright Tr. 776–780.

In the months preceeding the filing of the Second Delaware action representatives for the Debtor and the various constituen-cies negotiated with counsel for the Wright Group with the goal of improving the terms of the plan for common shareholders. Crary Tr. 801. Mr. Crary testified that the target figure sought by the Wright Group was, in fact $80 million. Crary Tr. 807–808. The Legal Representative testified that the figure constituted such a substantial modification to the plan that it could not be met without destroying the consensus of the parties in support of the plan. Silverman Tr. 589.

## II Discussion of the Law

### A. The Standards Announced by the Second Circuit

This court must determine the effect of the call for a shareholders meeting, to elect a board who will withdraw the plan of reorganization, and whether that call constitutes a clear abuse leading to irreparable injury.

Under the Second Circuit standard, clear abuse of the right to call a shareholders meeting is shown by demonstrating that the shareholders have an intent to jeopardize the reorganization (including a "willingness to risk rehabilitation altogether in order to win a larger share for equity"), (slip op. at 12) and by demonstrating that the effect of calling the meeting will be a "real jeopardy to reorganization." (*Id.* at 15.) Thus, the Second Circuit held that "clear abuse turns on whether the rehabilitation will be seriously threatened, rather than merely delayed, if Manville's present plan is not submitted for confirmation now." (*Id.* at 14.)

The Second Circuit held that a shareholders meeting should be enjoined if rehabilitation is placed at serious risk by the "real inability, within some reasonable time, to formulate any confirmable plan more satisfactory to equity", rather than by the mere intransigence of the other committees. (*Id.* at 12.)

The Second Circuit also held that, on remand this court should provide an articulated analysis of irreparable injury "for the benefit of the reviewing court." (*Id.* at

18.) However, the Second Circuit noted that "inquiries into clear abuse and irreparable injury will likely yield the same result in most if not all cases". (*Id.*) This is because the underlying facts will usually amount to serious jeopardy to the reorganization.

In directing this court to "analyze the real risks to rehabilitation posed by permitting.... a meeting of shareholders", the Second Circuit emphasized that this court has "a greater knowledge about this complex and perhaps fragile reorganization." (*Id.* at 21.) To determine whether the threat to the rehabilitation warrants the injunctive relief sought, this court has the right to consider the record as a whole in the entire Manville bankruptcy proceedings so long as reference is made to those "portions of the bankruptcy court's accumulated knowledge [upon which] it relied for decision." *Id.* at 17–18.

By its remand the Second Circuit has requested a more complete statement of this court's use of its "legitimate injunctive powers to control the future course of rehabilitation" through a "more elaborate inquiry into clear abuse and irreparable harm." *Id.* at 21.

### B. Application of the Standards Announced by the Second Circuit

A prime inquiry explored at the trial was to determine what adverse affect, if any, the call for a shareholders meeting would have on Manville's reorganization. (*Id.* at 20.) The evidence adduced at that hearing, relied upon herein, clearly established the serious threat and real jeopardy that will be posed to this reorganization if the shareholders are permitted to call for that meeting.

1.  The Equity Interests seek a shareholders meeting for the purpose of electing a new Board of Directors to withdraw the current plan of reorganization.

It is beyond peradventure that the intent of the Equity Interests, in commencing the Delaware actions, was to propose and elect a new Board of Directors "for the purpose of compelling reconsideration of Manville's presently proposed plan." *Id.* at 21. Reconsideration of the present plan has been the stated goal of the Wright Group since Manville's settlement with the Creditors Committee was announced. As noted above, Mr. Crary, a litigation analyst for Bear Stearns, who has acted as a representative for the Wright Group shareholders (Crary Tr. 424), discussed and analyzed the Creditors Committee Settlement in a Bear Stearns newsletter, The Litigation Report, published in April of 1986. Mr. Crary advised Manville shareholders that while "it appears questionable whether a litigation strategy will be effective in improving the position of shareholders to any great extent.... current shareholders might do well by simply *torpedoing* the agreement altogether, if possible, and then by paying off all existing claimants who have valid claims." Pl. ex. 7, at 10 (emphasis added). Crary concluded his article by noting that "shareholders have little to lose and lots to gain by settling in for a long but well-orchestrated campaign to *annihilate* the current plan." *Id.* at 9. (emphasis added) Clearly, these stated goals bear little resemblance to a mere "reconsideration of the present plan."

The commencement of the Second Delaware Action by the Wright Group has proven to be the means chosen to achieve the stated ends. As declared by the offices of the counsel for the Wright Group in a statement released to the press on September 24, 1986, a week after the Second Delaware action was filed, "if successful in Delaware, the plaintiffs intend to nominate a slate of new directors who, if elected, would file a plan of reorganization more favorable to common shareholders than the plan now proposed by the company." Pl. ex. 3, p. 1 (marked p. 2) The press release continued, "If an election of directors is called and the slate recommended by the plaintiff-common shareholders is elected, the common shareholders, through a new board of directors, would then have an opportunity to reorganize Manville on terms that would be beneficial to common

shareholders, rather than on terms that will virtually wipe out their entire interest." *Id.* at p. 3.

Mr. Charles Wright, a named plaintiff in the Second Delaware Action and as discussed above, an associate director of Bear Stearns' Chicago office, testified that as of the date of the press release it was his intention and hope, as both a litigant and a shareholder, to call a meeting and elect a new Board which would formulate a new plan of reorganization for Manville. Wright Tr. 763. Mr. Wright's shareholder-litigant persona, however, suffered an implausible fragmentation sometime subsequent to the press release. Under cross examination he testified with a discernable degree of evasiveness that as an individual shareholder he still anticipates and hopes that a shareholder meeting will be called, a new Board elected, and the plan reformulated, Wright Tr. 764. As a plaintiff, however, without control of subsequent events, he seeks only to call a shareholder meeting. Wright Tr. 774–775. This court refuses to strain its credulity in order to accept such disingenuous, self-serving testimony as to Mr. Wright's intentions at face value. His demeanor, especially under cross-examination was unresponsive, evasive and lacking in credibility. Wright Tr. 731.

Furthermore, the record clearly establishes that the aim of the Wright Group is a reformulation of the current plan and not merely an election of a new Board of Directors at the shareholders meeting sought in the Second Delaware action. Mr. Earl Parker, a director and officer of the Debtor who has been active in this reorganization since its filing, for example, testified that "Counsel for [the Wright Group] has stated a purpose of replacing the Board of Directors and withdrawing this plan and substituting a plan more to the liking of that group...." Parker Tr. 255. Prior to Mr. Wright's trial testimony, neither any individual member of the Wright Group, nor their counsel have made any effort to declare a more benign purpose. Thus, in light of all the evidence before it, the court can only conclude that it has always been and still remains the *in terrorem* intent of the Wright Group to call a shareholders meeting, *with a full awareness of the devastating consequences to the fabric of the reorganization,* in order to elect a new Board of Directors *who will withdraw or substantially modify the present plan of reorganization.*

The Equity Committee has similarly manifested its intentions to call a shareholder meeting for the purpose of electing a new Board who will replace the present plan of reorganization. In its Reply Memorandum of Law, dated September 10, 1985, filed in response to Manville's efforts to enjoin the First Delaware Action, the Equity Committee declared:

> Manville has alleged nothing more than that the Equity Committee rejects the Principal Elements Agreement made by the incumbent Board with the Legal Representative and desires a shareholders' meeting to enable shareholders if they wish, to elect a Board which may in turn act to reconsider the Principle Elements Agreement. *To this the Equity Committee pleads guilty.*

> Reply Memorandum of Law of the Committee of Equity Security Holders, September 10, 1985, p. 5.

It remains the unaltered conclusion of this court, *see In re Johns-Manville,* 52 B.R. 879 (Bankr.S.D.N.Y.1985) that the Equity Committee in utter disregard of the devasting consequences of its conduct, pursued the First Delaware Action in order to achieve a substantial change in the plan of reorganization more favorable to Equity than to those constituencies higher up on the ladder of distributive rights. Mr. Leon Silverman, the Future Representative, for example, testified that he believed it was the Equity Committee's intention to "elect a new Board of Directors, and the only purpose in that, unless one is a complete dunderhead, is to express dissatisfaction with what the present Board of Directors has done. Since the present Board of Directors has approved of the present plan, it does not require much to conclude that yes, they want to pull the plan. That's in addi-

tion to what has been said by members of that group." Silverman Tr. 608.

The Equity Committee presented neither evidence nor testimony to rebut the validity of these perceptions at trial. Further, the Equity Committee has stated no complaint with the day to day and over all management of Manville's businesses by the current Board of Directors. Under these circumstances it is hard for the court to conceive what other intentions might have motivated the First Delaware action. The Second Circuit imposed upon this court a mandate to "analyze the real risks to rehabilitation posed by permitting the Equity Committee to call a meeting of shareholders for the purpose of compelling reconsideration of Manville's presently proposed plan." slip op. at 21. The failure of the Equity Committee to affirmatively respond to this framing of the issue further supports this reasoning. The court thus concludes that the unauthorized activities of the Equity Committee in embarking on a litigating adventure in Delaware, *see, In re Johns-Manville*, 52 B.R. at 882, for the purpose of electing a new Board of Directors who will withdraw or substantially modify the present plan of reorganization without regard to the consequences, is little more than a cynical gamble that some more water could be forced from the existing stone.

2. Permitting the shareholders meeting poses a serious threat and real jeopardy to the reorganization.

a. The fragile consensus

The present consensus in support of Manville's Second Amended and Restated Plan of Reorganization has been achieved after four years of often bitter and always arduous struggle. The fact that there is a substantial but fragile consensus is not one that this court will take lightly. The prospects for any potential coalition forming around some new or competing plan is less than dismal especially if the plan calls for sacrifices to Equity. Similarly, the risks of attempting a reorganization via a Code section 1129(b) cramdown over non-consenting classes superior in rank to common shareholders is unrealistic given the nature of an essentially consensual plan now out for vote.

Furthermore, even were the Equity Interests to elect a new Board of Directors, this court, based on the record before it, finds the possibility that such a Board could successfully reorganize Manville is remote and unlikely. While there is no certainty that the current plan can clear the hurdles of confirmation under 11 U.S.C. 1129, there is far less certainty that any other plan has a chance at a run for confirmation within an acceptable period of time. In short, all parties are entitled to test the present plan at the presently scheduled December confirmation hearing. The Legal Representative, who was the chief architect of the present plan, and who has been the catalyst for the current consensus in favor of that plan, has stated without contradiction:

I do not think that Manville in its present guise can put forward a plan that will muster the support of any of the constituencies. And I know that to be an extravagant statement. But I have now been engaged in this process for two years. In the course of it, from having been told that a resolution was impossible by every constituency now involved, we have come to a point where each of the constituencies has given up and accommodated itself, so that we have in a sense a mosaic or a jigsaw puzzle which at its best is fragile.

For that to now be tampered with by the withdrawal of a plan so that major negotiations to realign positions can be undertaken, is to put us back for two years, with not only no promise of success but with a virtual promise of lack of success.

Silverman Tr. 535–536.

With the exception of the Equity Committee and the Wright Group, all the constituencies recognize and respect the fragile nature of this consensus. Parker Tr.

163 [36], Young Tr. 469 [37], Henderson Tr. 311 [38]. Based on this record, it is abundantly clear that the agreement of the parties is sufficiently tentative and tenuous, that it will not survive the dislocation engendered by a shareholders meeting. Indeed, as the Legal Representative has stated:

> "To put these things out of kilter ... I am talking about taking the plan off the table so that people will now be able to reconsider their positions de novo, is to almost guarantee that there will be no consensual plan. I will be perhaps even more extravagant. If a stockholders meeting is ordered and the necessary proxy material is circulated, and if the confirmation process is interfered with, the danger of losing a consensual plan is more than I would care to undertake were I in a position of authority to make that determination."

Silverman Tr. 538. The record does not in the slightest contradict this assessment.

### b. The Consequences of Destroying the Consensus

#### i. The End to Exclusivity

If the Equity Interests are successful in calling a shareholders meeting, it is almost certain that motions by one or more of the parties in interest for an end to the exclusivity period will be made. The record of the first two years of this case is replete with motions to end exclusivity. Based upon, *inter alia*, the continual dialogue and negotiation movement, those motions were heretofore denied. Renewal and fresh reconsideration of those motions is inevitable in the event of a shareholders meeting.

The end to exclusivity would result in competing plans. Ironically, there is no guarantee that such a result would better the Equity Interests' position. Parker Tr. 167.[39] The problems and complexities in the slow and painful process of building this consensus, which have been described above, would exponentially explode in the context of competing plans advanced by parochial interests. Even if only a shareholders plan should emerge in competition with the present plan, the unfolding of the statutory confirmation scheme would replicate the delay already experienced.

#### ii. Liquidation

Another possible consequence of a successful call for a shareholders meeting is a motion by one or several parties to convert this reorganization to a Chapter 7 liquidation. A Chapter 7 liquidation is, by definition, the antithesis of reorganization. Mr. Henderson, a member of the AH Committee, testified at trial that

> If this plan ... is pulled off the table ... it's not going to take more than four or five votes to move and, in my view, there are probably more like twice that number that would move away, as I would, and simply say, Let's finally get on to liquidating this company, because it seems to me that is the only thing that makes sense, because in that way, we can pool

---

**36.** Mr. Parker testified: "I would have to say that this is a very tenuous alliance. It's an alliance that was entered into after many compromises, it is wary and I think fragile alliance of the many creditor groups."

**37.** Mr. Young testified: "You have to realize that reaching this point in time where there is a plan that is up for a vote that's been presented to the property damage claimants has been a long process. It was a fragile process, there are many nay sayers among the property damage claimants. Many of them are looking for an opportunity to upset the apple cart. We hopefully do not want to give them that opportunity, but that will be presented if this plan is withdrawn.

**38.** Mr. Henderson testified: "[W]hile that [accepting the Plan] was the sense of the majority, these were items that were very delicate in terms of how a couple of three votes in the majority might have gone to dissent, that could have made the vote dangerously close. In short, there were—there was a considerable soft element in the majority that continues even to today."

**39.** Mr. Parker testified: "I think if that [the filing of a competing plan] happens that the equity would be severely harmed and more value would be taken from the equity than the presently proposed plan provides to them."

it [sic] on a billion and a half dollars perhaps.

Henderson Tr. 315.

While $1.5 billion, if accurate, is certainly a significant amount of money, it is also significantly less than any estimated value of the debtor as a going concern. It is certainly less than the upwards of $3 billion potentially available in the health trust settlement vehicle under the plan. Liquidation, furthermore, would not likely leave any recourse to future victims, save an empty corporate charter. *See In re Johns-Manville Corp.*, 36 B.R. 743; *In re U.N.R.*, 29 B.R. 741.

That the Asbestos Health Claimants would seriously consider such an option is an unsettling indication of the frustration that they feel. Mr. Crary, the self confessed intellectual leader of the Wright Group, Crary Tr. 422, himself testified that a liquidation scenario should be avoided.

> "At an early state [of discussion of strategies the Wright Group could pursue to better the position of equity shareholders] I was interested in the possible stragegy of whether it was possible to force Manville to switch from a Chapter 11 to a Chapter 7 liquidation. And I inquired about that. The result was that I was told it was really unrealistic strategy [sic], that it would do—it would put everybody in a worse position, including the common shareholders."

Crary Tr. 449.

### iii. The Appointment of a Trustee

A third possible consequence of a shareholders meeting is a motion pursuant to 11 U.S.C. § 1104, by one or more of the parties in interest, for the appointment of a trustee. Mr. Silverman, the Legal Representative, has been the single most influential proponent of the consensus thus far achieved. It has been his position throughout his efforts to negotiate that consensus, that if a plan that significantly differs from that currently under consideration were adopted, he would petition the court to appoint a trustee. Silverman Tr. 575. That posture is not unrealistic.

The immediate effect of such appointment would be to disrupt the debtor in possession status which would curtail the power of the shareholders in the context of corporate governance. Second, such an appointment would have a deleterious effect on Manville's business operations. Mr. Parker, a Manville director testified that, "The appointment of a trustee ... would have a disasterous effect on the confidence that Manville needs in its customer and employee groups to maintain profitable business operations." Parker Tr. 167.

At the very least the decision to appoint a trustee would grind these proceedings to a halt. The process of choosing an individual to fill that post and allowing him or her sufficient time to acquire the knowledge necessary to fulfill the statutory duties the post requires would result in a big delay. This delay, in and of itself, undoubtedly would have a negative influence on Manville's business operations, Parker Tr. 167 [40]. There is also no guarantee that the accord presently in support of the plan can be maintained while the parties wait to learn whether the Trustee is ready to become its proponent. As has been described above, within every constituency which supports the plan there are dissident factions which would welcome the opportunity to renegotiate the status quo. *See e.g.* Young Tr. 499.[41] Finally, this court is well

---

**40.** Mr. Parker testified: "I think also further exascerbating the situation would be the necessary delay and confusion and expense and prolonging this proceeding even beyond the four years that we have engaged here. I think all of those things would have a disasterous and probably fatal effect on the reorganization effort."

**41.** Mr. Young testified: "[S]ince we negotiated this plan, the property damage claimants in general have been faring very successfully in the world of litigation outside the bankruptcy courtroom. Many people do not view the settlement at $125 million or $130 million as anywhere near what would have been received against Manville if this was litigated in a common law court. They will use any opportunity of reopening to try to push their ideas, which are not favorable to this plan."

aware that the cost of delay should be avoided if at all possible.

#### iv. The Negotiation of a Plan Proposed by a New Board of Directors

As has been discussed above, absent some totally unforseen shift, there is real reason to doubt the ability of a new Board of Directors to achieve a consensual plan of reorganization within any reasonable or acceptable period of time. In accordance with the Second Circuit mandate to analyze all the consequences of a shareholders meeting, however, such a possibility must be considered. Thus for the sake of this discussion, the court will assume that the very real obstacles noted above are somehow avoided by a new Board of Directors who could have the luxury of the opportunity to negotiate a new plan of reorganization in a period of exclusivity.

There has been substantial and this court finds persuasive, credible testimony that the current negotiating postures of the parties will change significantly in the face of a new plan of reorganization. For some this will mean a return to positions held two years ago. The representatives for Asbestos Health Claimants, for example, reluctantly conceded their opportunity to seek punitive damages and the insulation of the reorganized company from suit in agreeing to the present plan. These are two very difficult issues which could once again become a source of contention between the parties. Henderson Tr. 311.

Other parties may choose a more aggressive negotiating posture than they held two years ago. The Property Damage Claimants, for example, agreed to settle $80 billion in claims for $125 million under the present plan. Mr. Young, a representative of that constituency, testified, however, that the Property Damage Claimants have enjoyed considerable recent success in other courts. This success has led many of the Property Damage Claimants to believe that it would be in their best interest to litigate and liquidate their $80 billion in claims and would pursue that option if the present plan were withdrawn. Young Tr. 467–469; *and see*, Silverman Tr. 536, 537 [42].

In addition to the difficulties a new Board would face in negotiating a new plan, there is the additional handicap that prolonging the reorganization imposes upon the business operation of the debtor corporation. Any business, of course, is adversely affected while undergoing a Chapter 11 reorganization. Manville is no exception. Mr. William Stevens, the president and chief executive officer of Manville testified that Manville's reorganization has had a negative impact on employee morale and the business opportunities available to the corporation. Stevens Tr. 337–338, 351–353.

To the extent that it has been able, Manville has dealt with these problems by persuading its employees, customers and suppliers that the present consensual plan of reorganization will be confirmed. Stevens Tr. 353. The proposal of a new plan which would face a long and difficult process of negotiation would undermine the confidence Manville's employees—Stevens Tr. 344 [43], and its customers and suppliers—have in its ability to resolve the problems confronting it. Stevens Tr. 356 [44]. The

**42.** Mr. Silverman testified: "The property damage claimants are being held into this process by the skin of our teeth. There are members of that group that are horribly concerned that they have given up their $80 billion dollars of claims—*without a resolution of which there is no way that Manville can be reorganized*. If that falls out of bed because a legal climate has changed in the United States, they will not trade ... in so statesman like a fashion as they have to date."

**43.** Mr. Stevens testified: "The absence of continuing to move along roads that have been

outlined to the employees would create, I think, a loss of confidence in that we have been communicating to the employees a set of expectations that the case is moving, there is a feasible solution. Pulling the existing plan off and the events that could follow and ensue as a result of that, could be not just damaging, but perhaps fatal to the company."

**44.** Mr. Stevens testified: "[C]ustomers would have lost confidence in us. As we have tried to explain, what we as a company are doing, they have granted us a degree of confidence—to fall back into that era of uncertainty without a visi-

corollary of this loss of confidence is the further erosion of Manville's business operations. Stevens Tr. 356–358.[45] Such a decline in business operations would have a direct impact on any plan the new Board could advance. The debtor would simply have less money to distribute to its creditors and the asbestos health victims. Stevens Tr. 358–60.[46]

The court finds that these two factors, the aggressive negotiating postures of the various constituencies and the declining value of the debtor's business operations, would make the likelihood of the confirmation of a new, consensual plan, speculative at best. Even under this 'best case' scenario, the consequences of calling a shareholders meeting would put the ability of this debtor to reorganization in jeopardy.

### 3. The attempt to call a shareholders meeting is a "clear abuse"

The fragile nature of the consensus in support of the present plan is and for some time has been apparent to this court and to the parties in interest. The consequences of the failure of this consensus are obvious to all. *See e.g.*, Silverman Tr. 597 [47].

Nor are there mitigating factors which would justify the actions of the Equity Interests that have imperiled this reorganization. The Equity Interests have alleged that the Debtor refused to negotiate in good faith with the Equity Committee and

Wright Group and that the Debtor excluded the Equity Committee and the Wright Group from meetings with the representatives of the Debtor's major constituencies. The record establishes the converse.

The Equity Committee offered no witness to substantiate these allegations. Furthermore, the court notes that the Equity Committee's counsel and investment bankers have made interim applications to this court for fees earned in plan negotiations with the Debtor and the various constituencies. In it's Tenth Interim Application for Allowance of Compensation and Approval of Reimbursement of Expenses, dated January 31, 1986, the counsel to the Equity Committee stated that "During this Compensation Period, and subsequent to the Manville Board of Directors' approval of the Principal Elements Agreement, Applicant met on nine separate occasions with counsel for the Legal Representative to discuss plan issues." *Id.* at 6. *See* Pl. Ex. 5, which is a compilation of excerpts of fee applications filed with this court detailing fee requests for, among other things, plan negotiations in the Ninth Interim Application, Tenth Interim Application, and Eleventh Interim Application, First Boston September 24, 1985 and January 28, 1986 Reports of Services and Hours.

The protestations of the Equity Committee that it has been "locked out" of plan negotiations ring hollow. The record clear-

---

ble exit from Chapter 11, that confidence would be a problem. I think we would definitely fall back and have significant business problems."

**45.** Mr. Stevens testified: "That loss of market share, that loss of business would naturally and logically, I think evolve into loss in sales and operating profits and cash flow."

**46.** Mr. Stevens testified: "I think just logically if the company earned less it would have less and so any subsequent plan would have to provide for less ... [T]he plan that is on the table today in my opinion provides or calls for not only the company to perform at least as well as it is today, but again to grow and grow significantly. If you start from a lower base, it would be logically impossible to create more."

**47.** Mr. Silverman testified: "Now, I don't understand why there is such difficulty in comprehending the dynamics of a situation which has

been laboriously put together and which is fragile, as you have heard from every constituency. Why is it so hard to understand that [if] this breaks, irremediably breaks if you muck around with it—and a new Board, taking it off the table mucks around with it.

I am not immune to Mr. Crary's newsletter which says torpedo, end, we will kill this.

That to me is precisely, and Mr. Kaiser, I don't mean to sound terribly moralistic to this, you obviously are representing a client, as I am representing a clientele.

But for Pete's sake, let's not kid around. It means that you want to break this plan and that means there is no plan. Nobody is going to stand around for two or three years while you are negotiating some major revision in what has been put together at very, very great time, effort, and compromise."

ly shows that more than any other constituency, Equity has had the ear of Manville management. The Board of Directors which has served as Debtor in Possession since the filing was elected by common shareholders shortly before Manville filed its Chapter 11 petition. In 1984, the Board was augmented by two directors whose nominations had been proposed by the Equity Committee. Indeed until Equity's interests were threatened by *any* dilution, the relationship between equity and management was quite cordial.

Once Manville was prepared to concede some dilution of equity interest, however, that relationship began to deteriorate. Manville's concession, however, was the predicate of any consensual plan. Furthermore, during the period in which Equity Interests have been the most severely threatened, the Equity Committee's own fee applications and the testimony on the record reveal that the Equity Committee negotiated with the Debtor and parties in interest quite frequently. That such negotiations were fruitless is a direct consequence of the Equity Committee's refusal to negotiate on the basis of the plans then under consideration. The difficulties, if any, of the Equity Committee have not been due to a "lock out", but rather, due to the Committee's own "walk out".

Similarly, the Wright Group's own witness testified to meetings and negotiations with representatives of the Debtor and the Legal Representative. (Crary Tr. 801–02) [48] Mr. Silverman, the Legal Representative, also testified to meetings and negotiations with representatives of the Equity Committee and Wright Group Silverman Tr. 566 [49], 584–587. Thus, the allegations of the Equity Interests are belied by the documentation of their own professionals and by witnesses. This court can only find that the Equity Interests negotiated extensively with representatives of the other constituencies about the present plan.

Therefore, in light of the record before it, this court concludes that the attempts made by the Equity Committee and the Wright Group to call a shareholders meeting constitute a clear abuse. As a result, these Equity Interests, do not have a right to call such a meeting. *See* slip op. at 9, and *In re J.P. Linahan, Inc.,* 111 F.2d 590, 592 (2d Cir.1940).

4. Calling a shareholder meeting will irreparably injure this reorganization.

Before an injunction may issue Manville must demonstrate that it will be irreparably injured by the actions it seeks to enjoin. slip op. at 18. The consequences of the efforts by the Equity Interests to call a shareholder meeting and the real danger they pose to this reorganization have been thoroughly discussed. This court finds that Manville has met its burden of proof. For all the reasons set forth herein, this court finds that the reorganization will be irreparably injured if a shareholders meeting is called at this time.

The court also notes that Manville is not the only party who will be injured by the actions of the Equity Interests. "There is nothing more irreparable than a person who is afflicted with an asbestos related disease, to be in a hospital or to die before he or she receives a nickel." Silverman Tr. 539. Each day of delay in this reorganization compounds the pain and suffering of the asbestos victims who have waited for over four years for any compensation for their injuries.

**48.** Mr. Crary testified to his meetings with representatives of the various constituencies during the last six months: "The lawyers for many of the constituencies [were present at those meetings]. I could name them. Herb Edelman [Debtor's counsel], Matt Gluck [counsel to the Legal Representative], Elihu Inselbuch [counsel to the Asbestos Health Committee], John Jerome and John Gellene [counsel to the Creditors Committee], maybe others."

**49.** Mr. Silverman testified: "Indeed we met with ... the Equity Committee, perhaps a dozen times between August [1985] and the end of the year, and our investment bankers met with [them] on various occasions during that time and the end of the year, in the hopes of having a negotiation that might resolve the differences between us."

## C. Conclusions

In summary, without in any way limiting the conclusions stated elsewhere in this opinion, the court concludes:

—that the record (*see*, especially, Section IB The Turbulent Proximate Overture, *supra*) makes it abundantly clear that the Equity Interests are engaged in frivolous and dilatory litigation, simultaneously filing pleadings and papers in numerous courts with the sole purpose to delay and frustrate the Debtor's reorganization; and—that in sharp contrast to those pre-petition parties, who were involuntarily drawn into a bankruptcy proceeding, the *Wright Group* shareholders who purchased stock subsequent to the bankruptcy filing, have voluntarily assumed a substantial risk; and

—that in considering irreparable harm, any balance of hardships among the competing parties in interest tilts, in this instance against the risk taking Wright Group; and

—that Debtor's rehabilitation will not merely be delayed, but rather, it will be seriously threatened if the plan currently out to vote is not submitted for confirmation as scheduled; and

—that no confirmable plan which would satisfy the demands of Equity yet avoid the serious risk to the reorganization could be formulated within a reasonable time; and

—that the Equity Committee and the Wright Group are willing to risk the Debtor's rehabilitation altogether in order to win a larger share for Equity and have demonstrated an intent to jeopardize the reorganization; and

—that a shareholders meeting will irrevocably injure the reorganization and thereby irreparably injure the parties in interest to this reorganization; and

—that clear abuse consistent with the standard established by the Second Circuit has been established.

Therefore, the relief requested in the Debtor and Intervening Plaintiffs' complaint for injunctive relief shall be granted.

## III Dismissal of the Counterclaim

In response to the Debtor's complaint, the Equity Committee brought a counterclaim, alleging *inter alia* a deficiency in the Disclosure Statement to the Debtor's Second Amended and Restated Plan of Reorganization. The deficiency is with respect to a lack of reporting of the Second Circuit decision. That decision issued almost simultaneously with dissemination of the plan package. These disclosure statement issues are appropriate for and may be raised at the hearing on confirmation. They are certainly outside the scope of the Second Circuit's remand. Accordingly, the joint application at trial of the plaintiffs to dismiss the counterclaim is granted.

In accordance with the foregoing, each of the Equity Committee Defendants and the Wright Group Defendants jointly and severally are stayed, restrained and enjoined from the prosecution of the Delaware Actions as stated in the Complaint.

It is SO ORDERED.

## APPENDIX

(a) transcripts of plan related hearings dated:

February 17, 1983, April 5, 1983, May 12, 1983, May 23, 1983, June 9, 1983, June 23, 1983, July 21, 1983, August 25, 1983, September 13, 1983, October 17, 1983, October 27, 1983, November 7, 1983, November 21, 1983, March 30, 1984, April 19, 1984, April 26, 1984, May 17, 1984, June 27, 1984, July 26, 1984, October 17, 1984, July 11, 1985, July 29, 1985, August 5, 1985, August 13, 1985, November 20, 1985, December 6, 1985, January 13, 1986, February 14, 1986, April 22, 1986, June 23, 1986, August 21, 1986, August 28, 1986.

(b) the motions filed by various parties in interest, and the papers and proceedings in connection therewith, for the appointment of a trustee, to deny further extensions of exclusivity, to dismiss these cases, to lift the stay under Section 362 of the Bankruptcy Code, to hold persons in contempt for

violation of the stay, for the appointment of a legal representative and for permission to have trials on the merits in the District Court of asbestos-related health claims.

(c) applications for interim compensation; the motion by Manville to approve its investment in the Stillwater mining project; the motion for the appointment of a separate committee of preferred stockholders.